UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
_____x

 In re:                                                                            Chapter 11

MEENA, INC.,                                                      Case No. 8-18-74693-reg

            Debtor.


_____x

In re:                                                                           Chapter 11

DESA OF NY, INC.,                                           Case No. 8-18-74694-reg

            Debtor.


_____x
In re:                                                                           Chapter 11

SDA, INC.,                                                           Case No. 8-18-74695-reg

            Debtor.


_____x
In re:                                                                           Chapter 11

CHOUDRY SAJID JAVAID and                           Case No. 8-18-74804-reg
GULMEENA JAVAID,

            Debtors.


_____x


*MEMORANDUM DECISION DENYING*
*THE MOTIONS OF GENERAL NUTRITION CORPORATION TO DISMISS CHAPTER 11*
*CASES OR, IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY*


*Introduction*

Before the Court are motions to dismiss, or in the alternative, seeking relief from the automatic stay by General Nutrition Corporation ("GNC") in four separate bankruptcy cases (collectively, the "Motions to Dismiss").[1] Three of the petitions were filed by Meena, Inc ("Meena"),[2] Desa of NY, Inc ("Desa")[3] and SDA, Inc. ("SDA")[4] (together the "Corporate Debtors"). The fourth petition was filed by Choudhry and Gulmeena Javaid, jointly (the "Individual Debtors" or the "Javaids"), who claim to be the sole shareholders of the Corporate Debtors.[5] GNC argues that relief should be granted because the Corporate Debtors and the Individual Debtors (together, the "Debtors") have filed for bankruptcy in bad faith, and that there is no possibility of reorganization. The Debtors oppose GNC's motion. After reviewing the parties' submission and considering the arguments presented at the hearing on August 20, 2018, the Court reserved its decision.

In its review of the record, the Court determined that important questions of law and fact were not adequately addressed by either the Debtors or GNC.[6] The most fundamental of these issues is the failure by either party to recognize that the Debtors are four separate legal entities that must be treated as such in these proceedings. Rather than introducing a factual predicate for the Court to determine this question, the parties seem to advance their arguments based on a faulty assumption as to the legal relationship between the Debtors. This failure is apparent in the District Court Order relied upon by GNC which does not include the Corporate Debtors. In fact, the

---

[1] Case No. 18-74804, Dkt # 11
[2] Case No. 18-74693
[3] Case No. 18-74694
[4] Case No. 18-74695
[5] Case No. 18-74804
[6] While not expressly analyzed, the Court finds that the failure by GNC to name the Corporate Debtors in a pre-petition lawsuit where the Corporate Debtors conducted business with GNC and currently occupy the premises owned by GNC created multiple problems in resolving the Motions to Dismiss. While GNC asserts that the order issued in that lawsuit should extend to the Corporate Debtors, the Court finds that to do so would violate the Corporate Debtors' due process rights.

Corporate Debtors were not parties to that proceeding. The parties' failure to treat each of the Debtors as distinct legal entities pre-bankruptcy and even post-bankruptcy requires the Court to address this issue in context of the merits of the Motions to Dismiss.  For the reasons more fully explained below, the Court denies the Motions to Dismiss without prejudice.

*Facts*

The Debtors have filed under Chapter 11 of the Bankruptcy Code (the "Code").[7] Each of the Corporate Debtors have nearly identical dockets, and all papers filed by the Debtors and GNC in each of the cases are identical. For efficiency, this Court will make references to papers filed in the Individual Debtors' case, however, the same papers were filed in each of the Corporate Debtors' cases.

The Javaids and GNC entered into multiple franchise agreements, three of which are the subject of this decision (separately the "Deer Park Franchise Agreement," the "Tanger Franchise Agreement" and the "Centereach Franchise Agreement," collectively the "Franchise Agreements").[8] On or around January 26, 2010 the Javaids and GNC executed the Deer Park Franchise Agreement for a store in Deer Park, New York (the "Deer Park Store").[9] On or around November 18, 2016, the Javaids and GNC executed the Tanger Franchise Agreement, for a second store in Deer Park, New York (the "Tanger Store"). On or around October 19, 2012, the Javaids and GNC executed the Centereach Franchise Agreement for a store in Centereach, New York (the "Centereach Store"). The Javaids and GNC also entered into two subleases for the Deer Park Store and the Tanger Store (the "Deer Park Sublease" and the "Tanger Sublease" respectively, together

---

[7] 11 U.S.C. § 101, etc.

[8] The Franchise Agreements are, for the most part, substantively identical, however the Centereach Franchise Agreement renumbers pages and renames attachments. The Deer Park Agreement and Tanger Franchise Agreement number and name all attachments, addenda and sections identically.

[9] The Deer Park Franchise Agreement was also entered into by Ahmad Fayaz and Khalida Fayaz, neither of whom are parties to this action. On April 18, 2018, Ahmad Fayaz and Khalida Fayaz assigned their rights under the Deer Park Franchise Agreement to the Javaids. Dkt # 27, Ex. A.

"the Sublease Agreements"). There is no sublease for the Centereach Store, however GNC is a tenant in an overlease and SDA occupied and continues to occupy the location.

The Franchise Agreements were executed by the Javaids, and do not name or reference the Corporate Debtors. The Franchise Agreements each grant a license to the franchisees to operate one GNC store.[10] The Franchise Agreements allow for the possibility that the franchisee might be a legal entity, rather than an individual. The Franchise Agreements specifically require that a corporate franchisee must comply with all state, federal and local law regarding permits, certificates, and licenses to do business, including "fictitious name registrations."[11] The Franchise Agreements require that an individual franchisee execute a guarantee of all obligations within the Franchise Agreements (the "Supplemental Guarantees").[12]

The Franchise Agreements set forth the rights and duties of each franchisee. Each franchisee is not permitted to sub-franchise, sell, assign, transfer, merge, convey or give away any interest in the franchise without the prior written consent of GNC.[13] The Franchise Agreements also provide for three different categories of defaults, resulting in three different scenarios for the franchisee. First, certain specific defaults by the franchisee result in automatic termination of the Franchise Agreements, without notice to the franchisee, with no opportunity to cure. Events of default by the franchisee that are affective without notice, with no opportunity to cure include failing to pay debts as they become due, the filing of a bankruptcy petition, and the appointment of a receiver.[14] The second types of defaults trigger the right to receive notice of the default, but no opportunities to cure by the franchisee.[15] Examples of defaults that require notice from GNC to

---

[10] The Franchise Agreements, § 2, ¶ A
[11] The Franchise Agreements, § 5, ¶ A
[12] The Deer Park Franchise Agreement and the Centereach Franchise Agreement, Attachment J; the Tanger Franchise Agreement, Attachment G
[13] The Franchise Agreements, § 18, ¶ B
[14] The Franchise Agreements, § 20, ¶ A
[15] The Franchise Agreements, § 20, ¶¶ B, C

4

terminate the agreement include the franchisee's abandonment of the business, the franchisee's engagement in illegal activities on site, and the franchisee's failure to maintain insurance required by the Franchise Agreements. The third types of defaults, which include any defaults not in the first or second categories, give the franchisee a 30 - day period to cure the default after receipt of a written notice of termination.  If there is no cure within the 30 - day period, then the Franchise Agreement shall terminate without further notice required.

The Franchise Agreements define "Affiliate" as "any person or Entity that directly or indirectly owns or controls the referenced party, that is directly or indirectly owned or controlled by the referenced party, or that is under common control with the referenced party."[16]

The Franchise Agreements require an addendum be executed and attached if the franchisee operates in a corporate form rather than in his or her individual name. Attachment G to the Centereach Franchise Agreement faintly circles the option indicating that the franchisee is a corporation.[17] Attachment G to the Deer Park Franchise Agreement is completely blank. Attachment D to the Tanger Franchise Agreement does not indicate what kind of legal organization the franchisee is, but does list Choudhry Javaid and Gulmeena Javaid as 50% owners each, and as the President and Secretary respectively. Despite this, Attachment D specifically lists the "Franchisee" as the Individual Debtors. Nowhere in any of the Franchise Agreements or their attachments is there a reference to or an acknowledgement of the Corporate Debtors.

The Deer Park Sublease is executed by the Javaids. The Tanger Sublease is executed by the Javaids individually, but lists Choudhry Javaid as "President" and Gulmeena Javaid as "Secretary." However, the Tanger Sublease does not refer to any of the Corporate Debtors, nor

---

[16] The Deer Park Franchise Agreement and the Tanger Franchise Agreement, Attachment B; Centereach Franchise Agreement, Attachment E.

[17] The attachment also indicates a faint writing on the line indicating that the franchisee is another type of legal organization. However, that writing is too faint to be legible.

does the document indicate the corporate entity for which the Individual Debtors are the "President" and "Secretary". There is no sublease for the Centereach Store.

The Javaids and GNC entered into two purchase money security agreements, dated October 1, 2010, and June 13, 2014 (together, the "Security Agreements"). The Security Agreements state that "collateral" is "all [i]nventory, [e]quipment and [f]ixtures, and all attachments, accessories and parts used or intended to be used with such property, wherever located, whether now owned or hereafter acquired…." Four UCC-1 financing statements (the "Financing Statements") were filed listing collateral as "inventory and proceeds now owned or hereafter acquired." The Javaids were named as the debtors on the Financing Statements and are the only signatories to the Security Agreements.[18]  The Corporate Debtors were not named as franchisees on the Franchise Agreements, were not signatories to the Security Agreements, and were not named as debtors on the Financing Statements.

Despite having no formal agreement with the Corporate Debtors, GNC regularly sold them merchandise and accepted payments from them, as evidenced by bank statements.[19, 20]  In its account statement for the Deer Park Store, GNC listed Meena underneath the name of the Individual Debtors.[21]  Lastly, GNC issued Meena a 1099-K in 2017.[22]  The record reflects that Meena conducts business from the Deer Park Store, Desa conducts business from the Tanger Store and SDA conducts business from the Centereach Store.

On August 14, 2017, GNC issued three notices to the Javaids by overnight delivery that the Franchise Agreements were terminated (the "Deer Park Notice of Termination," the

---

[18] The October 1, 2010 Security Agreement lists Ahmad Fayaz and Khalida Fayaz as co-debtors.
[19] The Debtors have only attached exhibits for Meena, however, they assert that such documents exist for SDA and Desa, too. GNC has not denied that the same documentation exists for all the Corporate Debtors.
[20] Dkt # 29 (the "Debtors' Brief"), ex. B
[21] Debtors' Brief ex. D
[22] Debtors' Brief ex. C

"Centereach Notice of Termination," and the "Tanger Notice of Termination," together "the Notices of Termination").[23] The Deer Park Notice of Termination stated that a notice of termination with opportunity to cure had been sent more than four years earlier, describing a pattern of wholesaling in violation of the Deer Park Franchise Agreement, and that subsequent audits indicated that the wholesaling activities had continued. In addition, the Deer Park Notice of Termination cited to ¶ 20(B) (xvi) of the Franchise Agreement regarding alleged violations of the licensing provisions.  Consequently, the Deer Park Notice of Termination stated that the Deer Park Franchise Agreement was "terminated effective immediately" and that the Deer Park Sublease was "automatically terminated" as a result. The Centereach Notice of Termination states that a notice of termination with an opportunity to cure was issued in December of 2016 as a result of wholesaling within the Centereach Store.[24] As with the Deer Park Store, an audit was conducted, and GNC determined that the wholesaling activities had not been cured, and therefore the Centereach Franchise Agreement, and the sublease associated with the Centereach Store was also "automatically" terminated.[25] As with the Deer Park Notice of Termination, the Centereach Notice of Termination cited to ¶  20(B) (xvi) of the Franchise Agreement regarding alleged violations of the licensing provisions.

The Tanger Notice of Termination differed from the Centereach Notice of Termination and the Deer Park Notice of Termination. The Tanger Notice of Termination resulted from a cross-termination clause included in the Franchise Agreements. Therefore, the Tanger Store was "terminated effective immediately" upon the termination of other franchise agreements with the

---

[23] Motions To Dismiss ex. I
[24] The Centereach Notice of Termination states that it serves as notice of termination of the franchise agreement for the store "located at the Deer Park Commons." However, the Centereach store is not located at the Deer Park Commons. This appears to be an error in the Centereach Notice of Termination.
[25] The Centereach Store does not have a sublease, but rather an "overlease" of which this Court has no record.

Javaids.[26] Moreover, the Tanger Notice of Termination stated that the Tanger Sublease "has also been terminated effective immediately." None of the Notices of Termination include an opportunity to cure, as each of the defaults cited therein resulted in termination immediately upon notice pursuant to the default provisions in the Franchise Agreements.

On August 15, 2017, GNC filed a complaint in District Court for the Western District of Pennsylvania against the Javaids individually (the "District Court Action"). The complaint in the District Court Action alleges, among other things, that the Javaids materially breached the Franchise Agreements, and that the Javaids committed fraud. The Corporate Debtors were not named as defendants in the District Court Action. On March 6, 2018, the Javaids and GNC executed a settlement agreement (the "Settlement Agreement").[27] The Corporate Debtors were not signatories to the Settlement Agreement. Under the terms of the Settlement Agreement, the Javaids were obligated to make two $150,000.00 installment payments to GNC on March 27, 2018 and on May 6, 2018, and make monthly payments of $14,583.33, among other things. If the Javaids failed to comply with any terms in the Settlement Agreement, GNC would be entitled to immediately repossess the stores without an opportunity to cure, and without further litigation. As a result of entry into the Settlement Agreement, the District Court Action was administratively closed on March 7, 2018. On June 11, 2018, GNC's counsel wrote a letter to the Javaids stating that they defaulted under the Settlement Agreement.[28] The letter noted that the Javaids did not make their two installment payments, nor did they make the initial monthly payment, and therefore GNC demanded the keys to the stores. As a result of the Javaids' default under the Settlement Agreement, the entire amount owed to GNC totaled $1,574,719.

---

[26] The termination of the franchises that initiated the Tanger Notice of Termination are located in Maryland, and are not subject to this decision.
[27] Motions To Dismiss, ex. J
[28] Motions To Dismiss, ex. K

On June 13, 2018, GNC filed an emergency motion in the District Court seeking to enforce the Settlement Agreement, and to order the Javaids to turn over the keys to the stores. The Court issued an order on consent of the parties on July 5, 2018 (the "Consent Order"), ordering the Javaids to pay the net revenue[29] from the operation of the stores to GNC from June 25, 2018 to July 12, 2018, to pay $319,387.99 before July 12, 2018 per the Settlement Agreement less any net revenue payments, among other things, and any failure to comply with the Consent Order would result in GNC having the right to immediately take control of the stores.[30] Again, the Corporate Debtors were not named in the emergency motion, nor were they directed to comply with the terms of the Consent Order.  As a result, the District Court did not obtain or exercise jurisdiction over the Corporate Debtors, and they were not afforded any right to appear or take part in the proceedings.

On July 12, 2018, the date GNC was to receive payment from the Individual Debtors, the Corporate Debtors each filed bankruptcy petitions. Meena's petition lists GNC as an unsecured creditor with a disputed claim of $300,000.00, and total debt of $400,000.00. Desa's petition lists GNC as an unsecured creditor with a disputed claim of $300,000.00 and lists $320,000.00 in total debt. SDA's petition lists GNC as an unsecured creditor with a disputed claim in the amount of $319,387.99 and lists $508,957.99 in total debt. All three Corporate Debtors do not list any secured debt in their schedules, and all the Corporate Debtors dispute all of the listed claims.

On July 17, 2018, GNC filed a second emergency motion in the District Court seeking to hold the Javaids in contempt of the Consent Order, to grant GNC a judgment in its favor, and

---

[29] The Consent Order defines "net revenue" as "revenue generated from the operation of the Stores through cash or credit card sales to legitimate third-party customers ... less 'Essential Operating Expenses,' which the parties agree is $650 per day total for the Stores …."
[30] Motions To Dismiss, ex. A

seeking sanctions.[31] This motion sought a judgment in the amount of $1,864,724.37, and was to be heard on July 19, 2018.

The Javaids jointly filed a bankruptcy petition on July 17, 2018, thereby staying the District Court Action.[32] The Javaids' petition does not include the inventory in the stores as assets. The only assets listed in the Javaids' schedules are their home, their cars, and typical household property, such as clothing, furnishings, and jewelry. Meena lists $40,000.00 of inventory in its schedules. Desa lists $50,000.00 of inventory in its schedules. SDA lists $60,000.00 of inventory in its schedules.

On July 23, 2018, GNC filed the Motions to Dismiss, seeking dismissal or relief from the automatic stay so that GNC can repossess the stores and the inventory within. The Motions to Dismiss do not differentiate between the Debtors when describing GNC's claim, and GNC alleges that it is a secured creditor with a claim in excess of $1.8 million.[33] Despite the fact that GNC shipped product to the Corporate Debtors and the Corporate Debtors occupied the stores, GNC asserts that the Corporate Debtors are legal strangers to GNC as they were not parties to the Franchise Agreements and were not named as defendants in the District Court action.[34]

On the same date, the Debtors each filed a motion to enforce the automatic stay, and seeking damages for alleged violations of the automatic stay.[35] The Debtors' motions are not the subject of this decision. On August 14, 2018, the Debtors filed opposition to GNC's Motions to

---

[31] Motions To Dismiss, ex B
[32] The Law Offices of Alla Kachan, P.C. represents the Corporate Debtors and the Individual Debtors, but no orders of retention have been entered in these cases.
[33] Motions To Dismiss, ¶ 7.
[34] Motions To Dismiss, ¶ 5.
[35] Dkts # 10, 13.

Dismiss (the "Debtors' Opposition").[36] On August 16, 2018, GNC filed a reply (the "GNC's Reply").[37]

On August 20, 2018, this Court heard oral argument on the Motions to Dismiss. During argument, an issue regarding GNC's purported cash collateral was raised. The Court directed the Debtors to return all post-petition transfers constituting cash collateral to GNC. The Court also requested briefs from the parties discussing whether a franchisor-franchisee relationship existed between the Corporate Debtors and GNC. On September 4, 2018, GNC filed its brief ("GNC's Brief")[38], and on September 5, 2018 the Debtors filed theirs ("Debtors' Brief").[39] The parties agreed to rest on these submissions.

### *<u>Discussion</u>*

1.  The Legal Relationship Between the Parties

Before turning to the merits of the Motions to Dismiss, a thorough discussion of the parties and their legal relationships is critical. From time to time, GNC as well as the Javaids have treated the Javaids and the Corporate Debtors as one and the same when it suits them, and separate legal entities when it does not. Prior to the commencement of these bankruptcy proceedings, GNC apparently shipped inventory and accepted payment from the Corporate Debtors and allowed the Corporate Debtors to run the businesses on behalf of the Javaids. In effect, GNC treated the Corporate Debtors as if they were parties to the Franchise Agreements. However, GNC never formally memorialized this relationship in writing, and GNC did not name them as defendants in the District Court Action.

---

[36] Dkt # 21
[37] Dkt # 22
[38] Dkt # 27
[39] Dkt # 29

The Corporate Debtors did not enter into any written agreements with GNC, the Corporate Debtors are not named parties to the Franchise Agreements, and they are not "identified as any parties to any other agreements or entered into in connection with the Franchise Agreements, including, without limitation, UCC[-1] [f]inancing [s]tatements and security agreements ... or subleases ...."[40] The Franchise Agreements also contain language restricting the transfer of the franchise to any other franchisee without GNC's consent,[41] and the Franchise Agreements specifically state that there are no third party beneficiaries to the Franchise Agreements.[42]

There is no basis in law to conclude that the transactions between GNC and the Corporate Debtors created a franchisor-franchisee relationship. The Corporate Debtors are each separate legal entities, and not merely doing business as the Individual Debtors. Unless and until the corporate veil is pierced, which GNC has neither alleged nor proven, the Corporate Debtors have no rights under the Franchise Agreements.

The Javaids are signatories to the three Franchise Agreements, the two Sublease Agreements, and the two Security Agreements. The Financing Statements only cover inventory owned by the Javaids because the Corporate Debtors are not named on the Financing Statements. However, there is no evidence that the Javaids purchased, paid for, or received goods from GNC. The Javaids' schedules do not list any of GNC's inventory as property. Among the legal consequences flowing from these facts are that GNC is not a secured creditor of the Corporate Debtors, and the Corporate Debtors are not franchisees. As a result, and for the reasons set forth below, GNC has no cash collateral rights with respect to the Corporate Debtors and the filings of

---

[40] GNC's Brief, ¶ 10
[41] Ahmad Fayaz and Khalida Fayaz assigned their rights under the Deer Park Franchise Agreement to the Javaids in April of 2018. The Javaids assigned a "minority interest" in the Centereach Franchise Agreement to nonparties Kelly Wong and Hong Bin Guan in on December 1, 2014. GNC's Brief, ex. B. GNC consented to both of these assignments.
[42] GNC's Brief, ¶¶ 11-17

the bankruptcy petitions of the Corporate Debtors had no effect on the Franchise Agreements. Finally, the Corporate Debtors have rights and obligations imposed by the Bankruptcy Code distinct from the Individual Debtors.

A. Secured Status

The Security Agreements contain a Pennsylvania choice of law provision. A UCC-1 financing statement was filed on June 10, 2010 naming the Javaids as debtors and GNC as the secured party with an interest in all owned and hereafter acquired inventory for the Deer Park Store. On May 14, 2018 a second UCC-1 filing was filed for the Deer Park Store naming the Javaids as debtors.[43] On November 13, 2014, a UCC-1 financing statement was filed naming the Javaids as debtors and GNC as the secured party with an interest in all inventory now owned or hereafter acquired for the Centereach Store. A UCC-1 financing statement for the Tanger Store was filed on or around September 14, 2017 listing the Javaids as debtors and GNC as the secured party with an interest in all inventory now owned or hereafter acquired. The Financing Statements clearly indicate that the debtors are individuals, and not an organization.[44]

The Financing Statements do not list the Corporate Debtors. Under Pennsylvania law, "a financing statement is sufficient only if it provides the name of the debtor." 13 Pa.C.S.A. § 9502(a)(1). Pennsylvania law specifically states how the debtor's name must be entered on a financing statement if the debtor is a registered corporation. ("A financing statement sufficiently provides the names of the debtor … if the debtor is a registered organization … only if the financing statement provides the name that is stated to be the registered organization's name on the public organic record most recently filed with or issued or enacted by the registered

---

[43] The first UCC-1 Filing also lists the previous co-franchisees of the Deer Park Store as debtors. However, the co-franchisees assigned their interest in the Deer Park Franchise Agreement to the Javaids in April of 2018. The second UCC-1 filing does not list the co-franchisees as debtors.

[44] Under each designated box requesting the "Type of Organization" the filer lists "Individual" or "No Type".

organization's jurisdiction of organization which purports to state, amend or restate the registered organization's name." 13 Pa.C.S.A. § 9503(a)(1)) Moreover, a financing statement that fails to sufficiently provide the name of a debtor pursuant § 9503(a) is "seriously misleading." 13 Pa.C.S.A. § 9506(b). In *In re Just for Kids, Inc.* 150 B.R. 123 (Bankr. M.D. PA 1992) the Court determined that a financing statement improperly listing an individual rather than a corporation was ineffective as to the corporation.

In *Just for Kids*, an individual was given a loan by a creditor ("the Bank") and, in return, granted the Bank a security interest in all the inventory and accounts of his business. The financing statement listed the individual's name as the debtor. Later, the individual incorporated his business and transferred the remaining inventory to the newly formed corporation. The corporate business operated for some time, purchasing and selling inventory. At some point the corporation filed for bankruptcy. The Bank maintained that the corporate debtor was an "alter ego" of the individual with whom the Bank had a perfected security interest in inventory, and that the Bank received no notice of the incorporation of the debtor. Therefore, the Bank argued, its financing statement was effective as to the now bankrupt corporate debtor and any inventory owned by it was the Bank's collateral. The Court, interpreting former 13 Pa.C.S.A. 9402(g) which has been amended to the aforementioned sections of the Pennsylvania law, ruled against the Bank. The Court stated that "in order to show perfection against the corporate bankrupt [d]ebtor, that corporate name must be on the U.C.C. Filing." *In re Just for Kids* at 124. Since the corporate name was not on the U.C.C. filing, the Court ruled that "the Bank's security interest certainly cannot attach to newly acquired corporate inventory and accounts." *Id*. However, the Bank would be an unsecured creditor with respect to the proceeds of the inventory originally transferred from the individual to the corporation.

Here, as in *Just for Kids*, the Individual Debtors were named on the Financing Statements. The fact that the Javaids incorporated their business does not extend the Financing Statements to cover inventory owned by the Corporate Debtors. In *Just for Kids*, the Court ruled that in order to have a perfected security interest against a corporate debtor, the corporate debtor's name *must* be on the financing statement. Since GNC failed to name the Corporate Debtors on the Financing Statements, the Financing Statements are ineffective to give GNC a perfected lien on any inventory owned by the Corporate Debtors.

In addition to failing to perfect a security interest in the inventory owned by the Corporate Debtors, GNC was never a secured creditor of the Corporate Debtors as they are not signatories to the Security Agreements. It should be noted, though, that any inventory sold to the Javaids, should the record reveal its existence, would be covered by the Financing Statements and Security Agreements, and thus GNC would have a perfected security interest in that collateral.

B. The Franchisor-Franchisee Relationship

The Debtors and GNC assume that the Franchise Agreements are terminated.[45] GNC does not specifically assert how the Franchise Agreements were terminated, but has submitted the Notices of Termination, the Settlement Agreement and the Consent Order. The Notices of Termination states that the Franchise Agreements have been terminated effective immediately. The Settlement Agreement states that, upon default of the Individual Debtors, GNC has the right "to immediately repossess the […] stores without opportunity to cure and without further litigation."[46] The Consent Order states that upon default of the Individual Debtors, "GNC will have

---

[45] The Debtors state that after entering the Settlement Agreement "Debtors' franchise agreements were terminated …" (Debtors' Opposition, ¶ 19(c)); GNC asserts that the Javaids do not have a license to sell GNC's goods "under the now-terminated franchise agreement." (Motions To Dismiss, ¶ 59).
[46] Settlement Agreement, ¶ 11

the right to immediately take control of the [s]tores without any interference by the [Individual Debtors].”[47] However, the Debtors argue that the Franchise Agreements are only terminated as to the Individual Debtors, and the Corporate Debtors' rights under the Franchise Agreements were preserved because “GNC has not at any time moved to sever [the] relationship pre or post-petition with the [Corporate Debtors] or initiate any litigation seeking to terminate the franchisor/franchisee relationship.”[48]

Upon an examination of the relevant exhibits, there is insufficient evidence to conclude that the Franchise Agreements were terminated pre-petition. The Notices of Termination do state that the Franchise Agreements are terminated “effective immediately.” However, the subsequent Settlement Agreement clearly states that the Individual Debtors “agree[] to comply with the [F]ranchise [A]greements applicable to the [ ] stores [they] currently operate[,]”[49] and that as long as the Individual Debtors comply with the conditions in the Settlement Agreement, they “will be allowed to continue to operate the [ ] stores, as a regular franchise, including buying product on credit.”[50] Further, the Consent Order, entered after the Individual Debtors' default under the Settlement Agreement, orders that the Individual Debtors pay the future net revenue from the stores, that GNC turn on the point-of-sale system, and orders that the Individual Debtors and GNC negotiate a final settlement.[51] The Consent Order specifically states that the “Consent Order does not waive any of the rights of the parties under the [Settlement Agreement].”[52]

Perhaps the Notices of Termination could have terminated the Franchise Agreements, but within the District Court Action, the Settlement Agreement and the Consent Order permit the

---

[47] Consent Order, ¶ 7
[48] Debtors' Brief
[49] Settlement Agreement, ¶ 7
[50] Settlement Agreement, ¶ 10
[51] Consent Order, ¶¶ 2, 4, 8
[52] Consent Order, ¶ 8

Individual Debtors to continue to operate the stores as franchisees. The Settlement Agreement states that the Individual Debtors are to comply with the Franchise Agreements. The Consent Order states that it does not abrogate the rights in the Settlement Agreement, and neither the Consent Order nor the Settlement Agreement specifically state that if there is a default in payment, the Franchise Agreements are terminated. Clearly the Franchise Agreements were intended to be in effect so that the Individual Debtors could operate the stores and generate "net revenue," that would be used to pay GNC.

The Settlement Agreement and the Consent Order give GNC the right repossess and "take control" of the stores upon default by the Individual Debtors. However, the Court does not find that these rights of GNC result in termination of the Franchise Agreements. In fact, under the Franchise Agreements, GNC always had the right to "to take possession" of the physical stores under certain circumstances.[53] The Settlement Agreement and the Consent Order simply reiterate the rights of GNC upon the further default by the Individual Debtors.

Having established that the Franchise Agreements were not terminated prior to the filing of the Individual Debtors' petition and the Corporate Debtors are not subject to the terms and conditions of the Franchise Agreements, there is a relationship between the Corporate Debtors and GNC. The nature of that relationship, however, remains unclear. The Corporate Debtors' names appear on account statements produced by GNC, the Corporate Debtors made payments to GNC, purportedly for franchise fees and rent, GNC issued 1099-K statements to the Corporate Debtors, and lastly, GNC purportedly sold inventory and shipped goods to the Corporate Debtors. As the record develops further, the legal relationship between GNC and the Corporate Debtors will

---

[53] Franchise Agreements § 21, ¶ E

become more defined. At this point the record is insufficient to state with certainty the nature of this relationship.

C. <u>Sublessor-Sublessee</u>

The Sublease Agreements have not been terminated as to the Individual Debtors. GNC asserts that the Sublease Agreements contain a provision that if the underlying franchise agreement is terminated, then GNC "shall have the immediate right of re-entry."[54] The Sublease Agreements also state that upon default of the underlying franchise agreements, the sublease "shall be subject to termination immediately upon [GNC's] written notice to [the Javaids]." GNC's assertion that the Sublease Agreements are terminated is based on its assumption that the Franchise Agreements are terminated. However, because the Franchise Agreements are not terminated, neither are the Sublease Agreements.

Nonetheless, the Court finds that the Corporate Debtors do not have a possessory right to each of the locations because the Corporate Debtors are not parties to the Sublease Agreements. The Debtors' papers state that the Corporate Debtors made sublease payments to GNC for each of the locations, but this alone does not give the Corporate Debtors possessory interests in the locations as a matter of law.

The Deer Park Sublease simply lists the Individual Debtors by name as the sublessees. The Tanger Sublease lists the Javaids individually as sublessees. The Tanger Sublease lists Choudhry Javaid is "President" and Gulmeena Javaid as "Secretary." However, the Tanger Sublease, like the Tanger Franchise Agreement, never states the entity to which these titles pertain. Moreover, the Tanger Sublease clearly states that the names of the sublessees are "Choudhry S. Javaid & Gulmeena Javaid." Therefore, Meena has no legal right to possess the Deer Park Store and Desa

---

[54] Tanger Sublease Agreement, § 15(vii), Deer Park Sublease Agreement, § 14(vii).

has no legal right to possess the Tanger Store. The Centereach "overlease" is not on record, but, to the extent it is similar to the Sublease Agreements, the Court finds that SDA has no legal right to possess the Centereach Store.

***Analysis***

I.  The Motions To Dismiss

GNC seeks dismissal of the Debtors' bankruptcy cases, or, in the alternative, relief from the automatic stay. Under § 1112(b) of the Bankruptcy Code, a party in interest may request dismissal of a chapter 11 case "for cause." The Code further suggests factors that illustrate "cause", including substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, gross mismanagement of the estate, unauthorized use of cash collateral, and more. Code § 1112(b)(4)(A)-(P). The list of factors is intended to be illustrative, and not exhaustive. *In re C-TC 9th Avenue Partnership*, 113 F.3d. 1304, at 1311 (2d Cir. 1997).

Courts in this Circuit have found that "cause" exists when a petition is filed in bad faith. *See generally C-TC 9th Ave.*; *see also In re Syndicom Corp.*, 268 B.R. 26, at 47 (Bankr. S.D.N.Y. 2001). In *C-TC 9th Ave.*, the Second Circuit affirmed the bankruptcy court's dismissal of a Chapter 11 case for lack of good faith, among other things. The Court listed factors indicative of a bad faith filing. The factors are as follows:

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the

debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.

*C-TC 9th Ave.*, at 1311 (citing *Pleasant Pointe Apartments, Ltd v. Kentucky Hous. Corp.*, 139 B.R. 828 (W.D.Ky 1992)).

In the case at bar, both parties largely treat all the Debtors as "one and the same." The Court disagrees, and therefore will analyze the Individual Debtors and the Corporate Debtors in turn.

### A. The Individual Debtors

The Individual Debtors' bankruptcy petition indicates that most of their debts are consumer debts, rather than business debts.[55] The Individual Debtors' Petition also states that they owe $396,073.00 in secured claims and $1,243,709.17 in unsecured claims.[56] Among the property owned by the Individual Debtors is a single-family home, two cars, modest personal property, and ownership of the Corporate Debtors.

The factors expressed by the Second Circuit indicative of a bad faith filing do not exist in the Individual Debtors' case. The Individual Debtors do not have many assets, but those assets are not the subject of a foreclosure action. The Individual Debtors' unsecured claims dwarf their secured claims. The Individual Debtors' financial condition is not the result of a two-party dispute, because there are at least two secured creditors, and the record does not reflect that GNC is among them. GNC argues that the timing of the petition indicates an intent to delay or frustrate GNC in the District Court Action. However, GNC has failed to show that it is a secured creditor in the Individual Debtors' case, as discussed above. The record is unclear as to how many employees, if any, the Individual Debtors have. There is no evidence that the Individual Debtors

---

[55] 18-74804, Dkt #1
[56] The Individual Debtors' schedules indicates that GNC has a $300,000.00 unsecured, disputed claim.

cannot meet their expenses. The factors indicated in *C-TC 9th Ave.* as indicators of a bad faith filing do not exist as to the Individual Debtors.

### B.   The Corporate Debtors

The factors indicative of a bad faith filing are also insufficiently present with respect to the Corporate Debtors. Meena's bankruptcy petition does not list any secured debt, lists $400,000 in unsecured debt, and its predominant asset is $40,000 worth of inventory.[57] Desa's bankruptcy petition does not list any secured debt, lists $320,000 in unsecured debt, and its predominant asset is $50,000 worth of inventory.[58] SDA's bankruptcy petition does not list any secured debt, lists $508,957.99 in unsecured debt, and its predominant asset is $60,000 worth of inventory.[59] Each of the Corporate Debtors have few debts other than that owed to GNC, however, there is no pending action against any of the Corporate Debtors because GNC did not name the Corporate Debtors as defendants in the District Court Action. While the timing of the Corporate Debtors' bankruptcy could be perceived as a tactic to delay the District Court Action, there is no evidence that these petitions were filed to delay a secured creditor's legitimate effort to collect on a debt. Lastly, according to each of the Corporate Debtors' August Monthly Operating Report, the Corporate Debtors' monthly receipts are between $23,000 and $42,000. Therefore, each of the Corporate Debtors do have cash flow.

The first six of the eight factors indicating a bad faith filing do not exist as to each of the Corporate Debtors, and therefore their cases should not be dismissed. As to the last two factors, the record is unclear how many employees the Corporate Debtors have, if any, and there is no allegation that the Corporate Debtors cannot pay their expenses.

---

[57] 18-74693, Dkt #1
[58] 18-74694, Dkt #1
[59] 18-74695, Dkt #1

In *Syndicom*, the Court found that evidence of a bad faith filing existed even though the *C-TC 9th Ave.* factors did "not match up, in every regard" to the facts before the Court. *Syndicom,* at 51. However, the Second Circuit in *C-TC 9th Ave.*, ruled that "a determination of bad faith requires a full examination of all the circumstances of the case; it is a highly factual determination but also one that may sweep broadly." *C-TC 9th Ave.*, at 1312. The Court in *Syndicom* held that, even though the *C-TC 9th Ave.* factors did not align perfectly, that the totality of the circumstances indicated that the filing was in bad faith. In this case, the *C-TC 9th Ave.* factors similarly do not align perfectly. However, unlike in *Syndicom*, the record here is undeveloped, thereby making a determination based on a full examination of all the circumstances impossible. Therefore, this Court is unwilling to find that bad faith exists as to any of the Debtors based on the record before it. That being said, the facts do not indicate that the Corporate Debtors will survive in Chapter 11 for very long because they have no possessory right to the stores and, they have no written agreements with GNC to sell its products.

II.     The Motion to Lift the Automatic Stay

In the alternative, GNC seeks to lift the automatic stay for cause, alleging that the petitions were filed in bad faith, that the Franchise Agreements and Sublease Agreements were terminated pre-petition, and the lack of adequate protection of its collateral. Section 362(a) automatically stays the commencement or continuation of a judicial proceeding against the debtor, the enforcement of a judgment against the debtor obtained before the bankruptcy petition, the repossession of property from the bankruptcy estate, and any action to recover a claim against a debtor, among other things. Nonetheless, a party in interest can seek relief from the stay "for cause, including the lack of adequate protection of an interest in property of such party in interest;" or if "the debtor does not

have an equity in such property and such property is not necessary for an effective reorganization." Code §§ 362(d)(1), (d)(2).

GNC argues that cause exists to lift the stay under § 362(d)(1) because each of the petitions were filed in bad faith, the Franchise Agreements were terminated pre-petition and the Sublease Agreements were terminated pre-petition.  Courts in this circuit have held that the analysis of dismissal for bad faith and lift stay for bad faith "are not substantively different from each other." *Syndicom*, at 48 (quoting *234-6 West 22nd St. Corp.* 214 B.R. 751, at 757 (Bankr. S.D.N.Y. 1998). As discussed above, the Court does not find that the factors indicating a bad faith filing are present as to any of the Debtors.

Although not specifically argued by GNC, the Second Circuit will also find cause to vacate the stay "based on unenumerated factors" from the Code including bad faith, failure by debtor to treat creditors fairly, and unfair debtor practices. *See Syndicom*, at 48 (citations omitted). In addition, where litigation was pending as of the petition date, Courts in the Second Circuit will often rely on factors set forth in *In re Sonnax Industries, Inc.* 907 F.2d 1280 (2d Cir. 1990) to determine whether to lift the stay to permit the litigation to continue.[60] Largely, the *Sonnax* factors do not apply to the case at bar, and thus they will not be analyzed. However, two factors seem to apply at least to the Individual Debtors: (10) the interests of judicial economy and the expeditious

---

[60] The *Sonnax* factors are: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms. *Sonnax* at 1286.

and economical resolution of litigation; and (12) impact of the stay on the parties and the balance of harms.

The interests of judicial economy weigh in the favor of maintaining the automatic stay and permitting the resolution of issues before this Court. GNC hopes to lift stay so that it can proceed in the District Court Action. However, the District Court Action only involves the Individual Debtors as the Corporate Debtors are not parties to the District Court Action. The Bankruptcy Court is the only forum where the Debtors are all included.   By virtue of the filing of the bankruptcy petitions all of the Debtors' assets, whether owned by the Corporate Debtors or the Individual Debtors, are property of separate bankruptcy estates under Section 541 of the Bankruptcy Code.  To the extent the Debtors have been treated by the parties as one legal entity in the past, this will not occur in the Bankruptcy Court.[61] Therefore, it is in the interest of judicial economy to permit the case to continue before this Court.

Furthermore, as to the last *Sonnax* factor, the balance of the harms weighs in favor of maintaining the automatic stay. Until the record is clear regarding the relationship between GNC and the Corporate Debtors, the Court is unwilling to find that maintaining the automatic stay will harm GNC more than the Corporate Debtors.

Lastly, GNC argues that the stay should be lifted pursuant to § 362(d)(2) because the Debtors do not have equity in the property and the property is not necessary for an effective reorganization.  Under Code § 365(d)(2), the movant "must show (1) the amount of its claim; (2)

---

[61] While counsel to the Debtors has not been retained by this Court to date, counsel should be mindful that in order to be qualified to represent a debtor's estate, prospective counsel must not hold or represent an interest adverse to the estate, and the attorney must be a "disinterested person."  11 U.S.C. § 327(a). Because counsel to a corporate debtor owes its duty to the corporation and not its principals, courts often find that counsel cannot represent a corporate debtor and the principals, as to do so would create a conflict of interest.  *In re Angelika Films 57th, Inc.*, 227 B.R. 29, 40 (Bankr. S.D.N.Y. 1998).  Counsel for the Debtors will have to overcome this issue if it seeks an order approving its retention in all of the cases.

that its claim is secured by a valid, perfected, lien in property of the estate; and (3) the debtor lacks equity in the property." *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, at 321 (Bankr. S.D.N.Y. 2001). As discussed above, GNC's claim is not secured by a valid, perfected lien on any property of the Corporate Debtors. Furthermore, the record does not indicate that GNC is secured as to any property owned by the Individual Debtors. Therefore, GNC's argument that cause exists to lift the stay because its security interest is not adequately protected is without merit.

### Conclusion

The Court does not find that dismissal of the Debtors' bankruptcy petitions, or relief from the automatic stay, are appropriate remedies at this time. The Motions to Dismiss are denied without prejudice to renew. Orders consistent with this Memorandum Decision shall be entered in the Debtors' cases forthwith.



**Dated: Central Islip, New York**
**November 6, 2018**

                 **Robert E. Grossman**
        **United States Bankruptcy Judge**